THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICO TAYLOR, Defendant-Appellant.

First District (1st Division)   No. 1—91—0560

Opinion filed March 15, 1993.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Bennett E. Kaplan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendant Rico Taylor was charged by indictment No. 88—12662 with two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) and one count of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2). Prior to trial defendant filed a motion to sever and a motion to suppress statements. The court granted defendant's motion to sever, but denied his motion to suppress statements. Following a bench trial he was convicted of two counts of first degree murder on an accountability theory and sentenced to 20 years in prison.

Defendant argues on appeal that: (1) he was not proved guilty of murder on an accountability theory beyond a reasonable doubt; (2) the trial court erred in admitting evidence of his gang affiliation; and (3) he was improperly convicted and sentenced on two counts of first degree murder where there was only one death. We reverse.

The following evidence was presented at trial.

Officer Martin Gainer testified that about 11 p.m. on July 20, 1988, he and his partner responded to a call involving a shooting at 9670 South Brennan Street in Chicago. When the two officers arrived at that location, they were met by two additional officers. Gainer stated that at the scene he observed four men standing over the prone body of the victim which lay near the curb. Gainer testified that the men looked in the direction of his vehicle as it approached, then the four men fled, including the defendant. Gainer testified that three of the men ran toward a vehicle parked about 20 feet from the victim, and the fourth man ran northbound on Brennan Street. Gainer stated that he approached the victim, who remained lying on the ground, and that the victim told him that Herbert Kendricks was the shooter.

Gainer testified that defendant was taken to the fourth district police station, where he was advised of his *Miranda* rights and where he gave a statement. Gainer testified that defendant stated:

"He and the other three individuals were in a car. They were driving on Brennan, saw Smith and the four of them exited the car and approached Smith. Herbert Kendricks produced a weapon, fired at Smith, Smith went down and three of them got back in the car and drove around the block."

During direct examination, the prosecutor asked Officer Gainer whether he ever had occasion to arrest anyone for gang-related activity. Defense counsel objected, arguing that there had been no foundation laid as to gang-related activity. The trial court overruled defense counsel's objection, stating:

"I think I have a fair belief of what is involved here. And in spite of the fact that there may not ever come a time when there is any evidence that would suggest that this occurrence was in fact gang related, that is to say that the shooting of the defendant in this case was in some way in furtherance of any gang objective, or activity. Nevertheless, the evidence is admissible for the purpose of establishing the identity of the defendant and their relation from each other. As it may tend to purport [*sic*] the element of the accountability. Whether or not it is gang related. That's what I think the law is in this area. So objection is overruled."

Officer Gainer then testified that he was familiar with gangs in the area and had arrested persons for gang-related activity. Over defense counsel's objection Gainer was asked if the Gangster Disciples had any insignias. The court overruled that objection also, and Gainer testified that he knew several insignias used by the Gangster Disciples and identified two tatoos from photographs of the victim. Officer Gainer also testified that the Gangster Disciples (Disciples) and the Vice Lords were enemies.

On cross-examination Gainer testified that he never saw defendant with a gun in his hand, nor did he see defendant fire any shots. Gainer further testified that defendant never told him that he shot the decedent, and that before decedent died the decedent said Herbert Kendricks shot him. Gainer further testified that decedent never told him that defendant agreed with Kendricks to shoot decedent, nor that he went to the location to do so.

Detective Angelo Pesavento testified that about 1:20 a.m. on July 21, 1988, he was assigned to investigate a shooting which occurred on the evening of July 20, 1988. Pesavento testified that as part of his investigation he and Detective George Karl interviewed defendant at the police station after advising defendant of his *Miranda* rights. Pesavento stated that defendant told him that he was in the area of 87th Street and South Chicago in a car. The car was being driven by Michael Page. Herbert Kendricks was in the front passenger seat and defendant was seated in the back seat behind the driver. Ray Hudson was seated next to defendant in the back seat. When the men were in the area of the shooting, Kendricks told Page that he wanted to drive around and look for Otha Smith. Defendant stated Otha was a Disciple. Defendant told Pesavento that Otha Smith had beaten Kendricks' younger brother and that Kendricks wanted to kill Otha Smith.

Pesavento stated that defendant told him he saw Kendricks with a handgun while they were in the car, and that Kendricks directed Page to look for Disciples as they drove to the area of 96th Street and Brennan Avenue, where they saw Otha Smith. Kendricks told Page to pull the car over, Kendricks got out of the car, fired the gun three times, then got back inside the car. They then left and drove to Kendricks' home, where he entered and returned shortly with a larger handgun. They then returned to the area of the shooting, and Kendricks got out of the car, fired shots, and the police arrived as everyone fled. Pesavento stated that defendant told him that Kendricks, Hudson, Page and himself were all members of the Vice Lords.

On cross-examination, Pesavento stated that there was no documentation in his police report that defendant knew Kendricks or Otha

Smith. The report did state that Kendricks was a Vice Lord. Pesavento stated that defendant never told him that he agreed with Kendricks to shoot Smith, or that the men were going to shoot other members of the Disciples other than Smith. Defendant never told Pesavento that he possessed a gun, nor that he shot anyone. Pesavento further testified that defendant did not tell him that he knew that Smith would be in the neighborhood that night.

Detective George Karl testified that at about 11 a.m. on July 21, 1988, he went to the juvenile intake center, where he picked up defendant and codefendant Michael Page and transported them to Area 2 police station. Defendant was placed in an interview room and Assistant State's Attorney O'Connor was contacted. After O'Connor arrived defendant was advised of his *Miranda* rights and he gave a statement.

Defendant gave his statement verbally first, and the statement was later reduced to writing. Detective Karl, youth officer Glynn and Assistant State's Attorney O'Connor were all present when the statement was given. After reading and correcting his statement, defendant and the others present signed the statement. Detective Karl testified that defendant told him that he understood English and could read. Defendant's statement was read into evidence.

According to the statement, on the night of the incident, defendant was at home when Page, Ray and Kendricks came to his home and got him. The four then went to Kendricks' home. Michael Page was the driver, and Kendricks asked Page to drive around in search of Otha Smith because Smith had beaten Kendricks' younger brother. Defendant stated that Kendricks wanted to kill Smith. Kendricks had a gun with him as they drove in search of Smith. Once Smith was sighted, Kendricks told Page to stop the vehicle, he got out and chased Smith. Kendricks eventually shot at Smith three times. After shooting at Smith, Kendricks ran back to the vehicle and drove back to his home. They then drove back to the scene of the initial shooting where Kendricks exited the vehicle again, made some remarks and shot in the air.

Defendant stated that Smith was affiliated with the Disciples and that Kendricks' brother was affiliated with the Vice Lords. The relationship between the two gangs was bad. Defendant further stated that he, Ray and Page were also affiliated with the Vice Lords.

Theresa McCastle also testified for the State. She stated that at about 11 p.m. on July 20, 1988, she was visiting her father's home at 9661 South Brennan Avenue. She stated that she heard three shots and ran to the front door. McCastle testified that she saw a white ve-

hicle parked in front of 9659 South Brennan Avenue and observed Herbert Kendricks in the street. McCastle knew Kendricks from grammar school. She testified that Kendricks was shooting towards a driveway.

McCastle stated that she saw three men leave the white vehicle, as Otha Smith staggered from the direction of the driveway. McCastle testified that Kendricks chased Smith, pointing the gun at Smith's face, but the gun did not fire and made only a clicking sound. The three men who exited the vehicle stood nearby it, while Kendricks stood about 40 feet away. McCastle stated that she ran two doors down the street to get her daughter and returned about five minutes later, but the white vehicle had driven away.

The parties stipulated that if the victim's mother were called to testify she would state that she saw the victim alive on July 20, 1988, and that on July 21, 1988, he died. The parties also stipulated that if Dr. Choi, a medical examiner, were called to testify he would state that on July 21, 1988, he performed an autopsy on the decedent and that decedent died from a bullet wound to the chest.

After the State's case in chief, the trial court denied defendant's motion for a directed verdict. Rico Taylor then testified on his own behalf. He stated that on July 20, 1988, he met Kendricks at Kendricks' home. At that time he did not see a weapon in Kendricks' possession. Later, defendant went home, and while sitting on his porch, Page, Hudson and Kendricks came by his house. The men drank beer and eventually Kendricks asked Page to take him home. Defendant stated that he was unaware at that time that Kendricks had a gun in his possession.

Defendant testified that when they arrived at Kendricks' home, Kendricks went inside, came out and Page drove to 95th Street, then back to Kendricks' home again. Kendricks then asked Page to drive around the corner. Defendant stated that Kendricks never mentioned looking for some specific individual, but that he did tell the men that someone had beaten his younger brother. Defendant stated that while they were riding in the vehicle, Kendricks did not say that he wanted to kill someone. Page stopped the vehicle, Kendricks got out and began talking with a man, later identified as the decedent, then started shooting. Defendant stated that the vehicle was about 15 feet away. The man fled as Kendricks followed after him.

On cross-examination, defendant testified that he did not know that Kendricks had a weapon on his person before Kendricks got out of the vehicle. Defendant stated that at the time of the shooting no one got out of the vehicle except Kendricks. Kendricks jumped back

into the vehicle, drove to Kendricks' home, where he entered, and returned to the vehicle.

On redirect examination defendant testified that he did not review the entire statement taken by the court reporter, nor did he write the words, "To see if Otha and the Disciples were there" in his statement given to the police. He further testified that the initials by the statement were not his.

After the presentation of evidence, the trial court found defendant guilty of two counts of murder on a theory of accountability and sentenced him to 20 years in the Department of Corrections. The court reasoned:

> "Prior to the shooting of Mr. Smith, defendant knew of the murderous intention of Mr. Kendricks, that he knew he was armed with a weapon, knew that Michael Page had been instructed to drive around the corner to determine whether or not Otha Smith and other members of the Disciples street gang were present. Thus, he joined with and attached himself to the murderous plan of Mr. Kendrick [sic] and his presence is not mere presence at the scene of a crime, but his presence is lending aid and comfort and his confidence [sic] to the murderous scheme of Kendricks. By that conduct, he makes himself an aider and abetter of Mr. Kendricks and is responsible legally for all of that which follows from having attached himself to that murderous scheme, along with Mr. Kendricks."

For the following reason, we reverse defendant's conviction.

Defendant argues that the trial court erred in finding him guilty on a theory of accountability. Specifically, defendant argues that the State failed to prove beyond a reasonable doubt that he actually participated in the commission of the murder. Defendant maintains that the State's evidence proved only that he had knowledge and was present at the scene of the crime. Defendant contends that this evidence alone was insufficient for the court to find him guilty on an accountability theory.

For a defendant to be convicted on the accountability theory, the State must establish beyond a reasonable doubt that (1) the defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime; (2) the defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. (*People v. MacFarland* (1992), 228 Ill. App. 3d 107, 122, 592 N.E.2d 471.) To prove that the defendant had the intent to promote or facilitate the crime, the State must establish beyond a

reasonable doubt that the defendant showed the criminal intent of the principal or was engaged in a common design. *People v. Stanciel* (1992), 153 Ill. 2d 218, 606 N.E.2d 1201.

■ Although the defendant does not have to actively participate in the overt act, mere presence at the scene, even with knowledge that the crime is being committed, is not sufficient to establish accountability for the actions of another. (*People v. Carrizales* (1992), 240 Ill. App. 3d 893.) Further, mere presence at the scene of a crime coupled with flight from the scene of a crime is insufficient to establish accountability. *People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105.

■ In this case, the evidence provided by the State proved that defendant did nothing more than ride in a vehicle in which the shooter was present. While defendant gave conflicting testimony regarding his knowledge of why Kendricks drove to the scene of the shooting, and whether Kendricks had a gun, it is clear that defendant did not participate in any act which attributed to the shooter's objective of murdering Otha Smith. The record is clear that defendant did not have a weapon, did not participate in planning or executing any plan to murder Smith or provide instruments in furtherance of that plan.

The State cites to *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 483 N.E.2d 944, for the proposition that where a defendant attaches himself to a group which has an objective of murdering another, the requisite knowledge and intent sufficient to establish accountability are shown. In *Gutierrez*, the victim was shot and killed as he fixed a flat tire in front of his home. The evidence presented at trial clearly showed that one of two codefendants, and not defendant, was the shooter. The evidence also showed that shortly before the shooting occurred defendant was observed sitting in his vehicle while one of the codefendants talked with him. Shortly after the shooting all three defendants were observed fleeing the murder scene and entering a second vehicle used as the getaway car. Further, the murder weapons were found inside the vehicle in which defendant had been observed earlier.

*Gutierrez* is distinguishable from this case. The evidence presented here showed no active participation by defendant as that of the defendant in *Gutierrez*. Here, defendant did not provide a vehicle in furtherance of the murder, as the defendant in *Gutierrez* provided the vehicle for disposing of the murder weapons. Nor did the evidence here show that prior to the shooting of Smith defendant met with the

shooter to plan the murder or getaway, as distinguished from the defendant in *Gutierrez.*

The State contends that defendant rode with Kendricks to the scene of the shooting knowing that Kendricks wanted to kill Smith. The State maintains that defendant made no effort to disassociate himself from the intentions of the group and, therefore, his actions demonstrated acquiescence to the group's purpose of killing Smith.

As mentioned above, the mere presence at the scene of the crime coupled with knowledge is insufficient to establish defendant's guilt on an accountability theory. (*People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105.) Moreover, the State has not provided this court with authority to support its contention that a defendant has an affirmative obligation to disassociate himself from a group with a knowing goal to accomplish a criminal purpose, and where failure to do so amounts to guilt on an accountability theory. Officers Gainer's and Pesavento's testimony is devoid of any evidence linking defendant to the agreement, participation or commission of the crime. Theresa McCastle's testimony was also devoid of any participation of defendant to facilitate the crime. Defendant himself testified that he did not know Otha Smith, did not have a weapon on his person, and simply rode in the vehicle with Kendricks and the other men.

Viewing the evidence in the light most favorable to the prosecution, we find that the State did not prove beyond a reasonable doubt that defendant was guilty of first degree murder under the accountability theory. The evidence showed that defendant was a passenger in the vehicle who simply rode to the scene of the shooting with the shooter. Defendant did not have a gun, did not drive the vehicle, did not plan the crime nor do any affirmative act in furtherance of the illegal purpose.

Based on the foregoing, the trial court erred in convicting and sentencing defendant for first degree murder on an accountability theory.

Accordingly, the judgment of the circuit court of Cook County is reversed.

Reversed.

CAMPBELL and BUCKLEY, JJ., concur.